IN THE UNITED STATES BANKRUPTCY COURT FOR THE
WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| IN RE: ) | |
| ) | |
| PETER G. BENDER, ) | Case No. 04-63316-ABF |
| ) | |
| Debtor. ) | |
| ) | |
| PETER G. BENDER, ) | Adversary No. 05-6038-ABF |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| VAN RU CREDIT CORPORATION, U.S. ) | |
| DEPARTMENT OF EDUCATION, ) | |
| UNIVERSITY OF MISSOURI, KANSAS ) | |
| CITY, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

Debtor filed this adversary proceeding seeking to discharge student loan obligations. This Court has jurisdiction pursuant to 28 U.S.C. 1334(b), and may hear and determine the issues in this case pursuant to 28 U.S.C. 157(a), 157(b)(1), and 157(b)(2)(I). This is a core proceeding. I find that the Debtor has not met his burden of proving that requiring repayment of his student loan obligation to the United States Department of Education would impose an undue hardship on him, so such obligation is nondischargeable.

Preliminarily, the Complaint was filed against three defendants. Trial was held on January 25, 2006, in Springfield, Missouri. At trial, Plaintiff's counsel announced that the action was being dismissed as to defendant Van Ru Credit Corporation. Counsel also announced that a stipulated judgment would be filed as to defendant University of Missouri-Kansas City. Pursuant to such stipulation, the obligation of $2469 to UMKC is to be paid at the rate of $50 per month until paid in full, without the debtor being required to pay interest, attorneys fees, penalties, or other charges. The precise terms of that agreement are

contained in the Stipulation of Settlement and Dismissal, which was filed on February 3, 2006.

The Debtor proceeded to trial as to the remaining defendant, the United States Department of Education (the Department). There is no dispute that, as of May 19, 2005, the Debtor owed the Department $117,850.7l, or that interest, penalties, and other charges have accrued since that date. There is also no dispute that the total amount the Debtor borrowed for his education was $65,046.87. Although he did not remember doing so, the Department's records show that the Debtor made one voluntary payment, in the amount of $147.00, on July 17, 1997.

The Debtor graduated from Southwest Missouri State University in 1991, with a B.S. in Psychology/Philosophy. He received a Juris Doctor degree from UMKC Law School in 1994. Upon graduation, he received a partial merit scholarship for the L.L.M. program in taxation at Washington University, from which he graduated in 1995. After graduation, he spent a short time doing tax work with a law firm in Illinois. When that job ended, he found it difficult to find another one, so he opened his own firm in November 1995. During the period from 1999-2001, in addition to his law practice, he sold manufacturing software along with his then-spouse. Upon his divorce in 2001, he testified that he received nothing from that business, but that he continued his solo law practice.

On July 28, 2003, the Debtor began work as an Assistant Public Defender in Springfield. Initially, his job classification was PD Level I. On July 1, 2004, he was promoted to Level II, with a current salary of $37,128, and take home pay of $2377.06 per month. According to Chris Hatley, his supervisor, the Debtor has held his current position long enough to be eligible for promotion to Level III, which now pays $41,676, but that such promotion typically takes 3-4 months after local approval. At Level III, Debtor's take home

pay would be $2515 per month. A Level IV Public Defender now earns $52,452, with take home pay of $3107 per month. Again according to the supervisor, new Public Defenders typically go from Level I to Level IV in a period of 1-4 years. The Debtor will have worked for the Public Defender's office for four years on July 28, 2007. In addition to his salary, Debtor is reimbursed for mileage to attend court outside of Springfield. He averages approximately $100 per month in such reimbursements. He testified that he enjoys public service work because it provides the opportunity to "give a little back." He also testified that the existence of this student loan obligation has made it difficult to get another job, because prospective employers often conduct credit checks. He did not state how recently he has sought other employment. In any event, he is eligible to retire from the Public Defender's Office at the age of 57 ½, which he said would be 18-19 years from the time of trial. There was no evidence of any medical condition or disability which would prevent his working beyond that age.

The Debtor filed his bankruptcy petition on December 24, 2004. Schedules filed on that date show total unsecured debt, with and without priority, of $164,204.68. Of the unsecured debt, the Schedules list a total of $144,503.64 representing student loan debt to the Department and to UMKC. At trial, the Debtor's counsel stated that the main purpose of the bankruptcy filing was to deal with student loan debt.

Debtor's schedules show total monthly expenses of $2291. As pointed out at trial, however, such total includes rent of $685 per month, when the actual figure is $625, thereby reducing scheduled expenses to $2231. Listed expenses include cable/internet charges of $95 and food expense of $300 per month. In addition, due to a poor driving record, Debtor pays $240 per month for car insurance. The listed expenses include those attributable to Debtor's work-related travel, for which he is reimbursed. With net income of $2,345, Debtor

has $114 per month after expenses.

The Department's Income Contingent Repayment Plan (ICRP) is a formula-based approach to tailoring the repayment burden to the borrower's ability to pay.[1] Under the ICRP, the annual payments are based on the income of the borrower and, if married, his or her spouse, for a period of 25 years. Certain types of income, including social security insurance payments, are not included for purposes of this calculation. Any amount not paid by the end of the 25th year is cancelled. The ICRP's flexibility was designed to make repayment affordable, particularly for borrowers who take "lower-paying community service jobs."[2] There is no dispute that, if Debtor chose the ICRP option, he would have current payments of $457.17 per month. Assuming he continued to be single without dependents, his payment at Level III income would be $534.90, and it would be $714.70 at Level IV. At Level IV, Debtor would have available income of $3107, less his current expenses of $2231, or $876. By making that payment for a period of 25 years, he would be entitled to a discharge under the provisions of the ICRP.

A second option available to Debtor would be a voluntary repayment agreement made in response to a notice of a non-judicial wage garnishment by the Department. According to the Department's publication, *Options for Financially-Challenged Borrowers in Default*, for a borrower who has received a garnishment notice, and responds by seeking to repay a student loan voluntarily, and is not claiming a hardship (discussed below), the Department is generally willing to accept – without documentation of expenses – an installment payment

---

[1] *See* Plaintiff's Exhibit N, U.S. Department of Education Federal Student Aid Borrower Services – Collections Group, *Options for Financially-Challenged Borrowers in Default* (October 2004), at 4 (*citing* 20 U.S.C. § 1087e(d)(1)(D)).

[2] H.R. Rep. No. 103-111, at 121 (1993), *reprinted in* 1993 U.S.C.C.A.N. 378.

arrangement under which the borrower pays 15% of disposable pay.[3]  This "15% of disposable pay" calculation appears to be based on the standards for the amount the Department would be able to obtain under a non-judicial wage garnishment permitted under 31 U.S.C. § 3720D and 34 C.F.R. Part 34.  In other words, borrowers can avoid garnishment of their wages if they propose to voluntarily pay the Department at least what it would receive under a non-judicial garnishment.

According to 31 U.S.C. § 3720D, the Department may garnish an individual's wages if the individual is not currently making required payments in accordance with any agreement with the Department, but such garnishment "may not exceed 15 percent of disposable pay."[4] The term "disposable pay" is defined as "that part of the compensation of any individual from an employer remaining after the deduction of any amounts required by any other law to be withheld."[5]

The Debtor's Schedule I shows current gross monthly income of $3094.  He shows a deduction for payroll taxes and social security of $654.  His disposable income for these purposes, therefore, is $2440.  Fifteen percent of that amount is $366.  Thus, the Department would accept, without evidence of his expenses or a showing of financial hardship, a proposal from the Debtor to voluntarily make payments in the amount of $366 at his current income level.

---

[3] *See* Plaintiff's Exhibit N, *Options for Financially-Challenged Borrowers in Default*, at 23.  This option appears to come from the requirement in the Debt Collection Improvement Act, 31 U.S.C. § 3720D(b)(4), which requires an agency covered by the statute, such as the Department, to provide an opportunity to a borrower who is subject to a garnishment to enter into a written agreement, under terms agreeable to the head of the agency, to establish a schedule for repayment of the debt.  *See also* 34 C.F.R. § 34.6(b).

[4] 31 U.S.C. § 3720D(a) and (b)(1).

[5] 31 U.S.C. § 3720D(g).

A third option is available to borrowers who want to repay voluntarily and can show financial hardship. In these cases, the Department is willing to accept – upon documentation of income and expenses – an installment payment amount based on available income after necessary household expenses, measured against certain standards.[6] Again, this option appears to be premised on the fact that the Department will permit a borrower to voluntarily repay the amount that the Department would be able to garnish from the borrower's wages, if the borrower shows financial hardship.[7] Borrowers asserting financial hardship must show that withholding the amount of wages proposed in the notice would leave them unable to meet the basic living expenses of themselves and their dependents.[8] In applying this standard, the Department compares the amounts that the borrower proves are being incurred for basic living expenses against the amounts spent for basic living expenses by families of the same size and similar income to the borrower's.[9] The Department regards the Internal Revenue Service standards as the applicable standard here.[10] If the borrower claims an amount that exceeds the IRS standard for a basic living expense, the borrower must prove that the amount claimed is reasonable and necessary.[11]

At the hearing in this case, the Debtor submitted evidence as to the IRS standards

---

[6] Plaintiff's Exhibit N, *Options for Financially-Challenged Borrowers in Default,* at 23.

[7] Upon receiving notice of the Department's intent to issue a non-judicial wage garnishment as described above, a borrower may object to the amount of the garnishment, and attempt to demonstrate that such garnishment would cause financial hardship to the borrower and his dependents. 34 C.F.R. § 34.7(a).

[8] In the actual garnishment context, the borrower bears the burden of proving financial hardship by a preponderance of the credible evidence. 34 C.F.R. § 34.14(c)(1).

[9] *Id.* at § 34.24(e)(1).

[10] *Id.* at § 34.24(e)(2).

[11] *Id.* at § 34.24(e)(4).

relevant for his income and family size.[12] Those standards provide, for a family of one with gross income of $2500 to $3333, monthly housing expenses in Greene County, Missouri, of $818, household expenses of $577 per month,[13] and transportation expenses of $475 for vehicle ownership plus $251 for operating expenses. These standard expenses total $2121.

The Debtor's actual expenses are $820 for housing, $570 for household expenses, $346 for a car payment, and $491 for operating expenses for his vehicle.[14] The Debtor's actual expenses for housing and household expenses, therefore, are about the same as the IRS standards. As to transportation, the Plaintiff's operating expenses exceed the IRS standards by about $250; however, he also testified that he is reimbursed approximately $100 for travel expenses through his employer, which reimbursement is not reflected here.

The Debtor testified that his current net income, after taxes and insurance deductions, is $2377,[15] plus approximately $100 per month in travel expense reimbursement, for a total of $2477. After deducting the IRS standard expenses of $2121, the Debtor has $356 left over which, under the Department's guidelines, would be available for payment on his student loans. If the Department accepted Debtor's explanations for increased travel expenses as reasonable and necessary, the Debtor's available income after expenses is $250. Hence, under this third option, the Department would appear to accept a voluntary payment between $250 and $356, depending on whether the Department accepted the Debtor's actual expenses as reasonable and necessary. The Department would review the Debtor's situation

---

[12] *See* Plaintiff's Exhibits K-1, K-2, and K-3.

[13] In Plaintiff's Exhibit M-1, the Plaintiff stated that the standard household expenses at his current income level was $494, which is the IRS standard amount for individuals with gross income of $1667 to $2449. However, because the Debtor's current gross income is $3,094, the correct figure for household expenses should be $577. *See* Plaintiff's Exhibit K-3.

[14] *See* Plaintiff's Exhibit M-4.

[15] *See also* Plaintiff's Exhibit M-1.

periodically, typically at six-month intervals.[16]

Finally, borrowers may "rehabilitate" their defaulted student loans by making twelve consecutive timely monthly payments and then having the holder of the defaulted loan sell the loan to a lender.[17] The Department reinstates the loan guaranty upon the sale to the lender and the borrower regains all the benefits of the original loan, such as the rights to deferment and cancellation, that were lost when the loan defaulted.[18] The loan may then be repaid under a new repayment schedule.[19] The amount of the payments for the twelve-month rehabilitation period must be "reasonable and affordable" based on the borrower's "total financial circumstances" assessed by the Department.[20] Counsel for the Department stated at trial that the Department has offered for the Debtor to make payments of $125 per month for the twelve-month rehabilitation period, based on the Debtor's "total financial circumstances." The payment amount after the twelve-month rehabilitation period will be analyzed after the loan is rehabilitated. However, the Debtor would then be eligible for forbearances and deferments at that time.

Instead of any of these options, the Debtor proposed that he be allowed to restructure the Department's obligation by reducing it to the original principal balance of $65,046, with such balance to be paid at the rate of $150 per month for two years, to be followed by payments of $340.78 per month for an additional 20 years. Such proposal would allow the Debtor to essentially retire from the Public Defender's office soon after he is first eligible to

---

[16] Exhibit N, *Options for Financially-Challenged Borrowers in Default*, at 23.

[17] Exhibit N, *Options for Financially-Challenged Borrowers in Default*, at 19 (*citing* 20 U.S.C. § 1078-6(a); 34 C.F.R. § 682.405).

[18] *Id*.

[19] *Id*.

[20] *Id.*

do so, and well before the age of 65, without taking the burden of this student loan obligation into his retirement.

Under § 523(a)(8), certain student loans are nondischargeable unless repayment of the loan would impose an undue hardship on the debtor or his dependents. The burden of establishing undue hardship, by a preponderance of the evidence, is on the debtor.[21] Unfortunately, the Code contains no definition of the phrase "undue hardship" and interpretation of the concept has been left to the courts. In this Circuit, the applicable standard is the "totality of the circumstances" test.[22] In applying this approach, the courts are to consider: (1) the debtor's past, current and reasonably reliable future financial resources; (2) the reasonable necessary living expenses of the debtor and the debtor's dependents; and (3) and the other relevant facts and circumstances unique to the particular case.[23] The principal inquiry is to determine whether "the debtor's reasonable future financial resources will sufficiently cover payment of the student loan debt – while still allowing for a minimal standard of living"; if so, the indebtedness should not be discharged.[24] The "totality of the circumstances" is obviously a very broad test, giving courts considerable flexibility. As a result, courts in the Eighth Circuit have looked to a number of facts and circumstances to assisting them in making this determination including: (1) total present and future incapacity to pay debts for reasons not within the control of the debtor; (2) whether the debtor has made

---

[21] *In re Reynolds,* 425 F.3d 526, 529 (8th Cir. 2005); *Andrews v. South Dakota Student Loan Assistance Corp. (In re Andrews)*, 661 F.2d 702, 704 (8th Cir. 1981).

[22] *Reynolds,* 425 F.3d at 532; *Long v. Educ. Credit Mgmt. Corp. (In re Long)*, 322 F.3d 549, 554 (8th Cir. 2003); *Andrews*, 661 F.2d at 704.

[23] *Long*, 322 F.3d at 544; *Ford v. Student Loan Guarantee Foundation of Arkansas*, 269 B.R. 673, 676 (B.A.P. 8th Cir. 2001).

[24] *Long*, 322 F.3d at 554.

a good faith effort to negotiate a deferment or forbearance of payment; (3) whether the hardship will be long-term; (4) whether the debtor has made payments on the student loan; (5) whether there is permanent or long-term disability of the debtor; (6) the ability of the debtor to obtain gainful employment in the area of the study; (7) whether the debtor has made a good faith effort to maximize income and minimize expenses; (8) whether the dominant purpose of the bankruptcy petition was to discharge the student loan; and (9) the ratio of student loan debt to total indebtedness.[25]

Counsel for the Debtor argues that this Court has the authority to restructure the student loan by reducing the amount due, and creating a new payment schedule. The Bankruptcy Appellate Panel for the Eighth Circuit has, in dicta, rejected the notion that a bankruptcy court has the authority to restructure a student loan, stating that "Congress could have provided that student loans will be dischargeable 'to the extent' excepting such debt would impose an undue hardship upon a debtor and his dependents," but it did not. This is especially true, according to the BAP, in light of the fact that "Congress used that phrase elsewhere in the Bankruptcy Code, including the three other subdivisions of the dischargeability section, 11 U.S.C. § 523(a)(2), 523(a)(5), and 523(a)(7)".[26] In Debtor's favor, the Sixth Circuit has long held that bankruptcy courts do have the authority to restructure student loans.[27] While not a student loan case, the Ninth Circuit appears to be prepared to follow the same course.[28] Nevertheless, I conclude that, while the quoted

---

[25] *See generally*, *In re Fahrer,* 308 B.R. 27 (Bankr. W.D. Mo. 2004).

[26] *In re Andresen,* 232 B.R. 127 (B.A.P. 8th Cir. 1999) (*quoting Hawkins v. Buena Vista College (In re Hawkins),* 187 B.R. 294, 300-301 (Bankr. N.D. Iowa 1995)).

[27] *In re Hornsby,* 144 F.3d 433 (6th Cir. 1998).

[28] *In re Myrvang,* 232 F.3d 1116 (9th Cir. 2000).

statement of the Eighth Circuit Appellate Panel in *Andresen* was not necessary to the panel's holding, the conclusion is a sound one.

That conclusion is supported by the decision of the Eleventh Circuit in *In re Cox*.[29] There, the debtor argued that since the Bankruptcy Code is intended to give debtors a fresh start, courts should be authorized to partially discharge student loans to the extent necessary to provide such fresh start. The debtor in that case also contended that Section 105(a) of the Bankruptcy Code[30] enables courts to fashion an equitable remedy, which might include a partial discharge. In rejecting both arguments, the Eleventh Circuit stated as follows:

> It is a well-settled rule of statutory interpretation that where there is no clear intention otherwise, a specific statute will be not controlled or nullified by a general one, regardless of the priority of enactment. Because the specific language of Section 523(a)(8) does not allow for relief for a debtor who has failed to show "undue hardship," the statue cannot be overruled by the general principles of equity contained in Section 105(a). To allow the Bankruptcy Court, through principles of equity, to grant any more or less than what the clear language of Section 523(a) mandates would be "tantamount to judicial legislation and is something that should be left to Congress, not the courts.'"[31]

I agree. Accordingly, I conclude that in a dischargeability action pursuant to § 523(a)(8), the Court does not have the authority to restructure or reduce the loan obligation, but only to determine whether a finding of nondischargeability as to the entire obligation would impose an undue hardship on the debtor or the debtor's dependents.

In any event, I find that, even if this Court were authorized to restructure or reduce a student loan obligation, there is no basis for doing so here, since the Debtor has not met his burden of proving that a finding of nondischargeability would impose an undue hardship on him. The Debtor's student loan funds were spent training him to be an attorney, and he has

---

[29] *In re Cox,* 338 F.3d 1238 (11th Cir. 2003).

[30] 11 U.S.C. § 105(a).

[31] *In re Cox*, 338 F.3d at 1243 (citations omitted).

worked in that field continuously since 1994. He started out intending to be a tax attorney; that didn't work out, but he has nevertheless continued to work as an attorney, and to benefit from his education. Since taking his current position, he has progressed in the Public Defender's Office, and there is nothing in the record to indicate that he will not continue to do so. Upon promotion to Public Defender Level IV, he will have sufficient income to meet the monthly payment due under the Income Contingent Repayment Plan. Upon making payments under that plan for 25 years, he would be relieved of further obligations. In any event, the Debtor need not limit his income to that he would receive as a public defender. Based on the trial experience he is accumulating, he could well be qualified at some point to leave the Public Defender's office and earn a higher income elsewhere. The Debtor testified that he has sought other positions through the years. Although it was unclear how recently he has sought other positions, as time goes by he is becoming more and more qualified for higher-paying employment as a trial attorney.

Further, he testified, without support, that the existence of this debt makes it more difficult for him to obtain other employment, because prospective employers often run credit checks.[32] While prospective employers may be wary of prospective employees whose wages are subject to garnishment, as the Debtor's are, that would not be the case if he were making payments on the loan under an approved program. And, with his bankruptcy discharge, any check of Debtor's credit should show that he has no unsecured debt other than his student loans.

The Debtor testified that he enjoys his current position because it allows him to give something back to society. While that is a commendable sentiment, he also gives back by

---

[32] *Cf.*, *In re Reynolds*, 425 F.3d 526 (student loan held to impose undue hardship where existence of student loan exacerbated debtor's mental illness).

repaying his student loans. The ICRP and other government programs are intended to enable him to do both, so if he chooses to work at a lower-paying job, that should not be a basis for discharging this obligation. Furthermore, the Debtor's current situation was created by events within his reasonable control. Debtor testified that, soon after being awarded an L.L.M. degree in taxation, he received a bill for his first monthly student loan payment, and that he "panicked". Despite the fact that he has been a practicing attorney for almost 12 years, he has made just one voluntary payment of $147. He now offers to pay the principal balance, without the interest and other charges that accumulated during the years that he, for all practical purposes, ignored his student loan obligations. His proposal would enable him to be rid of this obligation at the age of approximately 60 years old, even though there is no evidence that he will be unable to continue working past that age. While it would certainly be more comfortable for him to be able to pay the amount he proposes, on the schedule he proposes, that is not sufficient to demonstrate undue hardship under § 523(a)(8).

In sum, I find that the Debtor has not met his burden of proving that excepting his debt to the Department of Education would impose an undue hardship on him. An Order consistent with this Memorandum Opinion will be entered this date.

/s/ Arthur B. Federman
Bankruptcy Judge

Date: February 9, 2006

Copy to: Earl W. Brown
Katharine S. Bunn
Reidar O. Hammond